UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VINCENT EDWARD ROACH, SR, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-1421 |
| | § | |
| COMPASS MANUFACTURING | § | |
| INTERNATIONAL, LLC, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION ENTERING FINDINGS OF FACT**

**AND CONCLUSIONS OF LAW**

## I.      INTRODUCTION

The plaintiff, Vincent E. Roach, Sr., is suing Compass Manufacturing International, LLC ("CMI"), 5G Global Partners, Inc. ("5G"), and Michael E. Wolfe (collectively, the "defendants"), and seeks damages and attorney's fees for three claims stemming from the termination of his employment with CMI. Roach alleges breach of contract and conversion against CMI and 5G and civil assault against Wolfe. The defendants disclaim liability to Roach for his three causes of action and bring counterclaims for conversion, violation of the Texas Theft Liability Act, tortious interference with contract, and breach of fiduciary duty.

Roach filed this action in the 165th Judicial District of Harris County, Texas, on April 29, 2013. The defendants promptly removed the case to this forum, and the Court finds that jurisdiction is proper under 28 U.S.C. §§ 1332(a)(1) and 1441. After discovery was completed, the defendants moved for summary judgment on all claims and counterclaims. The Court denied the motion, and a bench trial was held on June 17 and 18, 2014.

## II.    FINDINGS OF FACT

### A.    Roach Joins CMI

CMI is a manufacturer and distributor of kitchen and bath products. It is owned and controlled by 5G. Michael Wolfe is the president of CMI and a shareholder of 5G. He runs the daily operations of CMI. Vincent Roach is the former senior vice president of sales for CMI.

Roach and Wolfe have known each other since the early 2000s when they both worked at Hughes Supply, a distributor of pipe, valve, and fitting products. Roach was vice president of sales in charge of the State of Texas, and he interviewed and hired Wolfe to be a branch manager for the Houston location. The two had a great relationship while at Hughes Supply, but after the company was sold to Home Depot, they accepted positions at different companies. However, they remained close over the years. They had similar backgrounds, faced similar challenges in their careers, and both were starting families at the time. Because they shared all of those things in common, they stayed in contact until they reunited professionally at CMI.

CMI offered Roach the position of senior vice president on January 8, 2012, and the terms of the offer were memorialized in a letter of the same date.[1] The letter provided for Roach's salary, outlined how performance bonuses would be determined, and discussed his eligibility for benefits. It also explicitly stated that Roach's employment would be "at-will," and provided for contingencies if Roach was ever terminated "without cause" or "for cause."[2] Roach signed the letter, accepted the offer,[3] and began working at CMI on January 18, 2012.[4]

---

[1] Wolfe was president of CMI at this time; he was the corporate officer who signed the letter.
[2] The parties never defined what constituted "cause" for termination.
[3] The method of acceptance was prescribed by the offer letter. Roach was required to sign and date the letter, sign and date the enclosed non-compete agreement, and mail or email all documents back to Wolfe.
[4] During Roach's tenure at CMI, the terms and conditions of his employment were actually governed by the offer letter, i.e., he was paid a $150,000.00 base salary in 2012, and that salary was paid in monthly installments.

Upon beginning his employment at CMI, the company issued Roach a laptop computer, an iPad, a digital camera and a smartphone. Roach was never given an ownership interest in that electronic equipment, and it was understood to be the property of CMI. Roach transferred his personal cell phone number to his company-issued smartphone, and CMI paid the charges associated with the number. There was no agreement as to who would keep the number in the event that Roach was separated from the company, and CMI has retained the number for its use in its business dealings with clients formerly served by Roach.

Danny Li, Todd Hublar, Ronny Robey, Chase Elzy, Kenn Sapp, Amy Schutz, and Sandra Godfrey are all current or former employees of CMI that were at the company during Roach's tenure. Li is the product development manager of CMI. He is also a director, the chief executive officer, and the largest shareholder of 5G. Hublar was the chief financial officer of CMI and is currently its chief operating officer. Robey is the warranties and claims manager. Elzy is a marketing salesman. Sapp was a vice president of sales and is currently the senior vice president of sales. Schutz was the kitchen division manager. Godfrey was the attorney for CMI; she is also Roach's mother.

**B.     Roach's Tenure at CMI**

CMI's culture is more closely associated with that of Sterling Cooper[5] than what would be expected in the typical corporate setting. At CMI, executives unwind during the workday with stiff drinks and encourage their subordinates to do the same. Shouting matches are seemingly as common as water cooler conversation. The use of profanity is rampant. And threatening an act of

---

[5] Sterling Cooper Draper Pryce is the fictionalized New York advertising agency in the television drama series *Mad Men*. AMC TV, MAD MEN, ABOUT THE SHOW, <http://www.amctv.com/shows/mad-men/about> (last visited Aug. 19, 2014). The Emmy and Golden Globe Award-winning program portrays segments of American society and culture of the 1960s, emphasizing ruthless competition, cigarette smoking, drinking, and adultery. *Id.* In particular, the show depicts "a world of liquor-stocked offices, boozy lunches, and alcohol-soaked dinners." Coeli Carr, *Television's Booze Hounds*, ABC NEWS (Sept. 10, 2010), <http://abcnews.go.com/Entertainment/televisions-treatment-alcohol-mad-men-rescue-pretty-picture/story?id=11574532>.

violence is tolerated if done in jest. This culture existed before Roach began working at CMI, persisted during his tenure at the company, and possibly endures today.

Despite this firm culture (or perhaps, because of it) Roach's sales team was successful in 2012, his first year at the helm. Wolfe praised the efforts of Roach and his team in rebuilding CMI's customer base, diversifying CMI's business, and increasing profit margins with key customers. Wolfe also commended Roach individually for attracting the very best manufacturers' representatives to CMI.

In October 2012, CMI began extensive discussions with Armando DeLeon, a Mexican businessman and owner of a manufacturing facility located in Mexico. The talks lasted several months. CMI was interested in setting up a distribution business in Houston, Texas, whereby they could distribute DeLeon's porcelain products from Mexico. Wolfe and Roach, as representatives of CMI, met with DeLeon on several occasions to develop the relationship. During a few of these meetings, the three discussed other potential business ventures they could embark on together, independent of CMI.

On or about April 12, 2013, Roach and Hublar met with Wolfe to discuss extending their severance protection. Roach and Hublar's contracts provided for six months of severance, while Wolfe's provided for twelve months of severance. Roach and Hublar believed they should have better protection in the event they were fired without cause, and they lobbied Wolfe to extend their severance package to twelve months. Wolfe, worried about the future of CMI, agreed that they should have better protection. Wolfe told them that he would protect them like his own children, but admonished that if they "f-cked him," he would "kill [them]." Wolfe then instructed Roach to tell Godfrey to memorialize their agreement to extend his and Hublar's severance

packages. Godfrey drafted the document on April 12, but it was not signed by any of the parties before they left for New Orleans the following week.

### C.    Roach's Termination from CMI

On April 18, 2013, Wolfe, Roach, Hubler, Schutz, Sapp and a number of other CMI employees were in New Orleans, Louisiana, for the Kitchen and Bath Industry Show, a conference and trade show for professionals in the industry. They spent most of the day at the New Orleans Convention Center setting up their booth for the show. Around 3:00 p.m., Wolfe, Roach, Hubler, Schutz, and Sapp went to a bar to enjoy each other's company over alcoholic beverages.

After having a few drinks, the group went back to the convention center and finished setting up for the show the next day. When the convention center closed for the evening at about 6:30 p.m., everyone went back to the hotel at which they were all staying. They congregated in Roach's suite to relax and socialize while eating pizza and drinking more alcohol.

About an hour into the gathering, Wolfe started a general conversation asking all present about any concerns they had regarding CMI. Robey asked a specific question about a recurring warranty issue with one of CMI's largest customers. Wolfe was slurring his words and Robey could not understand his response, so he asked Wolfe to repeat his answer.

At this point, Wolfe began to get agitated, and it was clear to many of those present that he was intoxicated. Wolfe then began arguing with Sapp about the same customer and their voices were raised. While Wolfe was yelling at Sapp, Roach sent a text message to Hublar saying, "Stop him!!!" Roach wanted Hublar to intervene and stop Wolfe from yelling at Sapp in front of everyone, which included lower level CMI employees. Roach immediately followed up with a second text message saying, "He is embarrassing himself," again in reference to Wolfe.

Wolfe ignored Hublar's attempt to intervene and shouted "Get the f-ck out!" at Sapp. Sapp left the hotel room, and he was followed by Elzy, Robey, and Schutz who were going outside to smoke cigarettes. Schutz, who does not smoke, testified that they left the room because it was very uncomfortable.

Only Wolfe, Roach, and Hublar remained in the room. Roach began to chastise Wolfe for the way he handled the situation with Sapp, and Wolfe became even more agitated. Eventually, Schutz and Robey come back into the hotel room, and Wolfe and Roach were still arguing. At this point, Hublar retired to his hotel room.

A few minutes later, Wolfe announced that he was going to leave and then started for the door. Before exiting the room, Wolfe abruptly about-faced and began stalking toward Roach, yelling, "You think I need you to run this f-cking company?! Well, you're wrong!" Wolfe's arm was raised and he was thrusting his index finger at Roach. He then shouted, "You're fired!" and left the room.

Roach was stunned. He sent a text message to Hublar that he had just been fired, to which Hublar responded "WTF???"[6] Roach then packed up his things, left the hotel, and drove back home. The next morning, Roach text Li, informing him that he had been terminated by Wolfe. Li thanked Roach for his "hard work for the company."

That same day, April 19, Roach sent a demand letter to Godfrey. He claimed that his employment was terminated without notice and without cause, and demanded the salary he was owed to date, his car allowance, his severance, and continued benefits. Godfrey did not help him draft the letter, she merely forwarded it to Wolfe and Li. She also drafted a memorandum, providing them with her opinion on CMI's legal position.

---

[6] "WTF" is a slang acronym for "what the f-ck?!" It is used to express surprise or disbelief.

On April 25, James U. Smith, III, of Smith & Smith Attorneys, sent a letter to Roach saying that he was terminated for cause. The letter explained that Roach was fired because he constantly underminded Wolfe and he breached his duty of loyalty to CMI. As such, he would receive no additional payment from the company.

On or about April 25, 2013, Godfrey was fired by CMI. After Godfrey was fired, Roach asked her to file this lawsuit for him. She did so on April 29.  Shortly thereafter, Roach retained his current counsel and was no longer being represented by Godfrey.

In July 2013, written demand was made to Roach for return of the electronic equipment he had been issued by CMI. Roach immediately turned over the equipment to his lawyer. In March 2014, the parties agreed to a protective order to guard any of Roach's personal information that was on the equipment. Roach's attorney then provided the equipment to the defendants. However, he did not give them the digital camera as it was not in his possession; Roach had given it to Li in January 2013, when they were in China on business.

## III.    CONCLUSIONS OF LAW

### A.    Roach's Claims

#### i.    Breach of Contract

Roach claims that he was terminated without notice and without cause, and he is therefore entitled to a damages award of $218,896.00 against CMI and 5G.[7] It is undisputed that Roach's January 8, 2012 offer letter is a valid contract. The parties do dispute whether Roach was terminated without cause, and whether the severance discussion between Roach, Hublar, and Wolfe evidenced a meeting of the minds such that their agreement supersedes the severance provision in the original contract.

---

[7] Roach maintains that he is owed: $42,904.00 as his 2012 bonus; $300.00 for his earned April 2013 car allowance; $13,192.00 as his 2013 bonus; $12,500.00 in salary in lieu of thirty days' notice for termination; and $150,000.00 for his twelve months of severance.

The Court is of the opinion that Roach was terminated without cause. In Texas, "good cause for discharging an employee is defined as the employee's failure to perform the duties in the scope of employment that a person of ordinary prudence would have done under the same or similar conditions." *Tave v. Alanis*, 109 S.W.3d 890, 893 (Tex. App.-Dallas 2003) (quoting *Lee-Wright, Inc. v. Hall*, 840 S.W.2d 572, 580 (Tex. App.-Houston [1st Dist.] 1992, no writ)). As explained in Section III.B.iii, *infra*, the Court does not believe the reasons proffered by the CMI executives as most of those reasons were contradicted by other testimony and documentary evidence admitted at trial. For example, Hublar testified that Roach was not terminated for poor job performance. Additionally, Wolfe specifically praised Roach's performance just four months prior. Moreover, there was testimony that Wolfe and Roach argued with each other in front of other CMI employee on a number of occasions and Roach had never been told that he was out of line. Wolfe has a volatile personality and desires to always be in control. Roach was fired because Wolfe was vexed and "drunk off his ass."

The Court believes Roach's recounting of the severance package discussion to be more probable than Wolfe's and Hublar's recollection. As such, the Court finds that Wolfe and Roach agreed to extend Roach's severance package from six months to twelve months. During their meeting, Wolfe made no mention that the modification and his agreeing to it was contingent on approval by the 5G board of directors.

The Court also finds that the modification is not barred by the statute of frauds. The statute of frauds bars oral contracts that cannot be completed within one year. TEX. BUS. & COM. CODE § 26.01(b)(6). However, "[w]here the term of performance is uncertain such as a contract that merely provides for the performance of a particular act that can conceivably be performed with one year, [the provision] does not apply, however improbable performance

within one year may be." *Gerstacker v. Blum Consulting Eng'rs, Inc.*, 884 S.W.2d 845, 849 (Tex. App.-Dallas 1994) (citing *Hall v. Hall*, 308 S.W.2d 12, 15 (Tex. 1957)). "Indefinite-term employment contracts are considered performable within one year and, therefore, do not fall within section 26.01(b)(6) of the statute of frauds." *Id.* (citing *Miller v. Riata Caddilac Co.*, 517 S.W.2d 773, 775 (Tex. 1974)). Roach's term of employment is indefinite, and his twelve months of severance payments could conceivably be paid within one year. Indeed, the payments could be made immediately upon his being terminated. Therefore, the statute of frauds is no obstacle to enforcement of the renegotiated severance payment.

Finally, the Court finds that the plain terms of Roach's employment contract state that he is to be paid an annual performance bonus. Although that contract provision was not artfully drafted, the most natural reading of it compels the conclusion that payment of the bonus is not discretionary. The minimum bonus he is to receive is "30% of annual salary." However, it is possible that he could receive a bonus in excess of this amount "based upon results of report card" and "company sales growth." The fact that Roach was never issued a report card and no other executive was paid a bonus has no bearing on the fact that he was entitled to receive a bonus of at least thirty percent of his annual salary.

In accordance with these findings, the Court determines that Roach is entitled to $218,596.00[8] from CMI.[9]

### ii.    Conversion

Roach has reversed his position and now acknowledges that he ceded his cell phone number to CMI during his employment. (Docket No. 52, Roach's Proposed Findings of Fact, ¶

---

[8] The requested $300 reimbursement for an unpaid car allowance for one-half of April 2013 fails for a lack of proof.
[9] Roach recognizes that his employment agreement was with CMI (Docket No. 52, Roach's Proposed Findings of Fact, ¶ 1) and has provided no evidence or case law to support contention that 5G, CMI's parent company, is also liable under the agreement. Therefore, the Court will not impute liability to 5G.

25). He maintains that he "is not entitled to any recovery for conversion of the cellular telephone number." (*Id.* at ¶ 26). As such, Roach's conversion claim is dismissed with prejudice.[10]

### iii. Assault

Roach argues that he is entitled to recover $5,000.00 in damages from Wolfe, individually, for assault by threat.

"The elements for civil assault mirror those required for criminal assault." *Umana v. Kroger Texas, L.P.*, 239 S.W.3d. 434, 436 (Tex. App.-Dallas 2007) (citing *Johnson v. Davis*, 178 S.W.3d 230, 240 (Tex. App.-Houston [14th Dist] 2005, pet. denied)). A person commits an assault if he "intentionally or knowingly threatens another with imminent bodily injury." *Moore v. City of Wylie*, 319 S.W.3d 778, 782 (Tex. App.-El Paso 2010). A threat is "a declaration of intention or determination to inflict punishment, loss or pain on another, or to injure another by the commission of an unlawful act." *Cook v. State*, 940 S.W.2d 344, 347 (Tex. App.-Amarillo 1997) (quoting BLACK'S LAW DICTIONARY 1480 (6th ed. 1990)).

The Court is of the opinion that Wolfe did not threaten Roach with imminent bodily injury. The fact that Wolfe was within a few feet of Roach and vehemently shaking his finger in Roach's face does not evidence an intention or desire to strike or otherwise injure Roach. That Roach was present when Wolfe tackled Li during an argument a few months prior has no bearing on whether Wolfe's actions this night were threatening. During Roach's time at CMI, he had a number of heated arguments with Wolfe and none had ever turned violent. They both have strong personalities, and it is not uncommon for a person to use illustrative hand gestures during

---

[10] The Court expresses no opinion on whether a cellphone number can be the subject of a conversion claim. *Cf. Staton Holdings, Inc. v. First Data Corp.*, 2005 WL 1164179, at *6 (N.D. Tex. May 11, 2005) (holding that a cause of action for conversion could lie because the particular phone number was of immense value to the plaintiffs, but noting that not all telephone numbers may be subject to such an action).

an argument. Because Wolfe did not touch, explicitly threaten, or otherwise evidence that he was going to strike Roach, the Court finds in Wolfe's favor on the civil assault claim.[11]

### B.   The Defendants' Counterclaims

####    i.   Conversion and the Texas Theft Liability Act

The defendants claim that Roach converted and unlawfully appropriated the laptop, iPad, digital camera, and smartphone issued to him by CMI.[12]

Conversion is "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997) (citing *Bandy v. First State Bank*, 835 S.W.2d 609, 622 (Tex. 1992)). To prevail on their claim of conversion, the defendants must prove that: "(1) [they] owned or had legal possession of the property or entitlement to possession; (2) the [plaintiff] unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the [defendants'] rights as [owners]; (3) [they] demanded return of the property; and (4) the [plaintiff] refused to return the property." *W.E. Stephens Mfg. Co. v. Goldberg*, 225 S.W.3d 77, 81 (Tex. App.-El Paso 2005) (internal citations omitted).

To prevail on their claims under the Texas Theft Liability Act ("TLA"), the defendants must establish: (1) they had a possessory right to the property; (2) the plaintiff unlawfully appropriated the property in violation of the Penal Code; and (3) they sustained damages as a result of the theft. *See* TEX. CIV. PRAC. & REM. CODE §§ 134.001-134.005; *see also Wellogix, Inc. v. Accenture, LLP*, 788 F.Supp.2d 523, 542 (S.D. Tex. 2011) (Ellison, J.) (internal citations

---

[11] The Court notes that an explicit, verbal declaration is not required to find that a threat has been made. For example, if Wolfe had made a fist and then raised it ominously, clenched his fist and pounded it into his other hand, or menacingly rolled up his sleeves or unbuttoned his shirt (all common indicators of an impending brawl), the trier of fact could reasonably conclude that Wolfe was declaring an intention to inflict pain or injury upon Roach.

[12] In the defendants' submission on proposed finding of fact and conclusions of law, they only refer to the "computer equipment CMI provided" to Roach. (Docket No. 57). Although the defendants make no reference to the digital camera or the smartphone, the Court will address the claims for the computer equipment and the smartphone. The defendants have no claim relating to the camera because it has been in Li's possession since January 2013.

omitted). Appropriate means "to bring about a transfer or purported transfer of title" or "to acquire or otherwise exercise control over property other than real property." TEX. PENAL CODE § 31.01(4).

The defendants' conversion and TLA claims fail for three reasons. First, Roach lawfully and with authorization exercised dominion and control over the electronic equipment. The items were given to him by CMI when he assumed the position of senior vice president of sales. Second, Roach surrendered the property to his counsel after written demand was made so his counsel could facilitate its return to the defendants. The lawyer promptly informed the defendants that the property was in his possession and began making arrangements for its return. And third, the defendants presented no evidence that they suffered actual damages.

### ii.   Tortious Interference with Contract

The defendants claim that Roach tortiously interfered with their contract with Godfrey, their attorney.[13]

To establish their tortious interference claim, the defendants must show that: (1) they entered into a contract with Godfrey; (2) Roach willfully and intentionally interfered with that contract; (3) the interference proximately caused them damage; and (4) they suffered actual damage or loss. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002) (citing *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996)).

The defendants offered no evidence at trial to establish the second or fourth elements of their claim. There was no testimony, based on first-hand knowledge, or documentary evidence showing any improper conversations between Roach and Godfrey. Roach flatly denied asking Godfrey to be his lawyer, advocate for him, or intervene on his behalf with the defendants while

---

[13] The Court notes that the retainer agreement was between Godfrey and 5G, and it made no mention of CMI or Wolfe. However, the Court will assume *arguendo* that the agreement covered all the defendants.

she was retained by them. She did not begin to represent Roach until after she was fired. The defendants also failed to provide any testimonial or documentary evidence that they incurred any damages or loss when they fired Godfrey and sought new counsel.

Accordingly, the Court finds in Roach's favor on the defendants' tortious interference counterclaim.

### iii.    Breach of Fiduciary Duty

To prevail on their breach of fiduciary duty claim, the defendants must establish that: (1) they had a fiduciary relationship with Roach; (2) Roach breached his fiduciary duty to them; and (3) Roach's breach resulted in injury to them or benefit to him. *See Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.-Dallas 2006) (citing *Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex. App.-Texarkana 2004, no pet.)).

An informal fiduciary relationship existed between CMI and Roach. *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) ("An informal fiduciary relationship may arise between an employee and employer.") (citing *Molex, Inc. v. Nolen*, 759 2.d 474, 479 (5th Cir. 1985); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513 (Tex. 1942)). However, Roach's relationship with Wolfe did not create a fiduciary relationship. *See Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) ("not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship") (internal quotation omitted). The fact that they previously worked together and became friends is not sufficient, by itself, to establish a fiduciary relationship between them. Although Roach described himself as Wolfe's "wingman," it is clear that Wolfe did not completely trust him, as evidenced by the concern that Roach may "f-ck him" in their dealings with Li.

Because Roach was a limited fiduciary of CMI, he owed the company the duty of good faith and fair dealing. *Kinzbach*, 160 S.W.2d at 512; *Mims v. Beall*, 810 S.W.2d 876, 880 (Tex. App.-Texarkana 1991) (internal citation omitted). "The duty of good faith and fair dealing merely requires the parties to 'deal fairly' with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to [traditional] fiduciary duty." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (1992), superseded by statute on other grounds as noted in *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225-26 (Tex. 2002).

The Court is of the opinion that Roach did not breach the limited fiduciary duties he owed to CMI. Wolfe, Roach, and Hublar had many conversations about starting other companies in which they would each have an ownership interest. The discussions sometimes centered on business ventures they could embark upon with DeLeon. The Court finds the testimony from CMI executives regarding Roach's efforts to undermine Wolfe and usurp business opportunities from the company is less than credible. Hublar reluctantly conceded that Roach was not fired for job performance reasons and acknowledged that there was no documentation whatsoever (no text messages, no emails, no intra-office notes or memoranda) evidencing the shortcomings CMI executives testified Roach possessed. Hublar also testified that he had no knowledge of Roach ever sharing confidential information with anyone outside of CMI. Wolfe similarly testified that he has no evidence or reason to believe that Roach violated his non-compete and non-disclosure agreement.

The Court concludes that Roach abided by his duty of good faith and fair dealing, and therefore, the Court finds in Roach's favor on the defendants' breach of fiduciary duty claim.

IV.     CONCLUSION

For the foregoing reasons, the Court FINDS in favor of Roach on his breach of contract claim, DISMISSES his conversion claim with prejudice, and FINDS in favor of Wolfe on the plaintiff's civil assault claim. Additionally, the Court FINDS in favor of the plaintiff on the defendants' counterclaims of conversion, liability under the Texas Theft Liability Act, tortious interference with contract, and breach of fiduciary duty.

Pursuant those findings, the Court determines that Roach is entitled to $218.396.00 in damages. Because Roach prevailed and has been awarded damages on his breach of contract claim, he is entitled to an award of reasonable and necessary attorney's fees and costs. TEX. CIV. PRAC. & REM. CODE § 38.001(8); *Green Int'l*, 951 S.W.2d at 390. Roach must submit his request for fees and costs by Tuesday, September 2, 2014. The defendants will have until Friday, September 12, 2014, to respond.

It is so **ORDERED**.

SIGNED on this 21st day of August, 2014.

_____
Kenneth M. Hoyt
United States District Judge